# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

Jose and Maria Chavez,

        Plaintiffs,

vs.

Ralph Hunt, Mark Rios,
Andrew Scharnweber
and Michael Demik,

        Defendants.

CV 01-245-TUC-FRZ (JR)

**REPORT AND
RECOMMENDATION**

      This matter was referred to Magistrate Judge Rateau for Report and Recommendation. In the pending Motions for Summary Judgment (Docs. 235 (Defendant Hunt) and 238 (Defendants Demik, Rios, and Scharnweber), the Defendants claim that the Plaintiffs' constitutional rights were not violated and, even if they were, that they are entitled to qualified immunity. Additionally, Defendants Rios and Scharnweber claim that the applicable statute of limitations bars recovery against them. For reasons that follow, the Magistrate Judge recommends that the District Court, after

1

conducting an independent review of the record, deny Defendant Hunt's motion for summary judgment and grant Defendants Demik, Rios and Scharnweber's motion for summary judgment.

## I.    Procedural History

The complex and lengthy procedural history of this case is partially set forth in the District Court's Order of September 30, 2008:

> Plaintiffs initiated this case on May 25, 2001. Their First Amended Complaint ("Complaint") was filed on January 7, 2002. The Complaint named as defendants the United States of America, the United States Immigration and Naturalization Service Commissioner James Ziglar, United States Border Patrol Sector Chief David Aguilar, and fifteen current and former Border Patrol agents. The Complaint alleges: (1) assault; (2) battery; (3) false imprisonment/false arrest; (4) intentional infliction of emotional distress; (5) negligence; and (6) constitutional violations (monetary, declaratory, and injunctive relief). *Id.* Defendants filed motions to dismiss or in the alternative motions for summary judgment seeking to dismiss the entire case. At the same time Plaintiffs filed their responsive briefs opposing dismissal, Plaintiffs filed their Rule 56(f) motion seeking deferment of any ruling on the alternative motion for summary judgment as Plaintiffs had not had any opportunity whatsoever to conduct discovery. In 2002, the Honorable David C. Bury (who presided over the case at the time) ordered nearly all of the substantive claims dismissed whereby only a minor property damage claim remained of the case. As the motion to dismiss was granted, the Rule 56(f) motion was denied as moot as well as the alternative motion for summary judgment. Subsequently, Judge Bury recused himself from the case, the case was reassigned to Magistrate Judge Marshall, and the parties proceeded to a bench trial before Magistrate Judge Marshall in 2005 whereby she found in favor of Plaintiffs in the amount of approximately $3700. Thereafter, Plaintiffs appealed Judge Bury's previous dismissal order.  On March 27, 2007, the Ninth Circuit issued an order affirming in part, reversing in part, and remanding for further proceedings. *See Chavez v. U.S.*, 226 Fed.Appx. 732 (9th Cir. 2007).  As relevant to the current state of the remanded case, the Ninth Circuit reversed the dismissal of Plaintiffs' *Bivens* claims as to Agents Rios, Demik, Scharnweber, Hunt, Obregon, Chavez, Campbell, Ziglar and Aguilar, and reinstated Plaintiffs'

2

claims for equitable relief under the Fourth Amendment. As the Ninth Circuit found that the dismissal of these claims pursuant to Rule 12(b)(6) for failure to state a claim was erroneous, the Ninth Circuit also found that the previous denial of the Rule 56(f) motion and motion for summary judgment as moot was also error. Thus, the Ninth Circuit remanded the case to properly address these motions.

(Doc 118).

After remand to the district court, the following transpired:

After the Ninth Circuit reinstated plaintiffs' *Bivens* claims against the supervisory  defendants, the Supreme Court decided *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In light of *Iqbal*, the supervisory defendants filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The district court denied the motion, finding that the supervisory defendants failed to provide a plausible nondiscriminatory explanation for the alleged stops. Moreover, the district court held that plaintiffs did not need to allege that the supervisory defendants directly participated in constitutional violations. Instead, citing *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991), the district court held that the plaintiffs had plausibly alleged that the supervisory defendants had either knowingly refused to terminate a series of acts they reasonably should have known would cause constitutional violations, acquiesced in constitutional deprivations by subordinates, or displayed reckless or callous indifference to others' rights.

*Chavez v. United States*, 683 F.3d 1102, 1107-1108 (9th Cir. 2012).

The supervisory defendants appealed that decision and on June 20, 2012, the Ninth Circuit found that the claims against all of the supervisory defendants (except as to Defendant Hunt) should be dismissed.  The court reasoned that even if the Plaintiffs sufficiently alleged that the border patrol agents conducted the stops without reasonable suspicion, they did not allege sufficient facts to support the additional requirement that a reasonable supervisor would have found their conduct to be clearly unlawful. *Id.* at 1111.

3

The mandate in the second *Chavez* decision was issued on August 15, 2012. (Doc. 195). Following that decision, the remaining Defendants were Scharnweber, Rios, Demik and Hunt. Remaining against these Defendants are *Bivens* claims alleging that the individual Defendants violated Plaintiff's Fourth Amendment rights under the Constitution.[1]

In the Motions for Summary Judgment, the Defendants claim that the Plaintiffs' constitutional rights were not violated and, even if they were, that they are entitled to qualified immunity. Additionally, Defendants Rios and Scharnweber, claim that the applicable statute of limitations bars recovery against them.

## II.    Factual Background

For purposes of these summary judgment motions, the court views the evidence in the light most favorable to the non-moving party. *See, e.g., Sullivan v. Oracle Corp.*, 662 F.3d 1265, 1270 (9th Cir. 2011).

### A.    The Chavez Shuttle

Plaintiffs Jose and Maria Chavez have been married for 31 years. PSOF[2] ¶ 1. Between 1998 and May 2003, the Plaintiffs operated a shuttle between Tucson and

---

[1] Under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395-96 (1971), a federal court may award damages against federal officials in order to compensate a person for a violation of their constitutional rights.

[2] "PSOF" refers to the Plaintiffs' Separate Statement of Facts in Support of Their Opposition to Defendants' Motion for Summary Judgment (Doc. 248).

Sasabe known as the Chavez Shuttle.  PSOF ¶ 2; DSOF[3] ¶ 1.  The shuttle van was usually driven by Jose, although Maria filled in on an emergency basis.  PSOF ¶ 5.  Initially, the Chavez Shuttle made three daily trips between Tucson and Sasabe, but later reduced the number to two.  PSOF ¶ 22.  In Sasabe, passengers were picked up near the port of entry and at the general store, where tickets could be purchased.  PSOF ¶¶

During the time the Plaintiffs operated the shuttle, there were approximately 100 residents in Sasabe.  PSOF ¶ 4; DSOF ¶ 2; HSOF[4] ¶ 2.  There are approximately 10 pedestrian and 80 to 100 vehicle legal crossings per day from Mexico into the United States at the Sasabe port of entry.  PSOF ¶¶ 11, 13.  Most of those crossing were thought to be bound for Tucson.  PSOF ¶ 19.   During that time, the Chavez Shuttle was stopped by Border Patrol Agents on almost a daily basis.  PSOF ¶ 21.  Jose Chavez estimates that 80% of the stops yielded nothing illegal.  PSOF ¶ 28.  Jose Chavez agrees with Border Patrol estimates that approximately 80 persons were removed from the shuttle as undocumented aliens over a four year span.  PSOF ¶ 29; DSOF ¶ 5.

The Plaintiffs never asked their passengers if they had authorization to be in the United States.  Jose Chavez was not comfortable asking passengers to provide him with immigration documentation because when he had done so previously, passengers yelled

---

[3] "DSOF" refers to Defendants Scharnweber, Rios and Demik's Statement of Facts (Doc. 237).

[4] "HSOF" refers to Defendant Hunt's Statement of Facts (Doc. 236).

at him and threatened to sue him.  PSOF ¶ 41; DSOF ¶ 7.  Additionally, Border Patrol had confirmed that he was not required to ascertain the immigration status of his passengers.  PSOF ¶ 38.

### B.    Stops of the Chavez Shuttle

#### 1.    Defendant Rios

Defendant Rios was a patrol agent in the Border Patrol Tucson Station from 1993 until 1998, and was a supervisor from 1998 to 2001, but continued to work in the field at times through mid-2001.  PSOF ¶ 49.  He acknowledges that he may have encountered the Chavez Shuttle during the course of his duties, but does not remember any specific encounter with the Plaintiffs.  PSOF ¶¶ 50, 51.  Jose Chavez contends that Rios threated to strike him in the mouth during one stop after Chavez asked Rios to stop yelling at him.  Jose Chavez does not recall the date of the stop.  PSOF ¶ 52.

According to Border Patrol records that are not in dispute, on September 8, 1997, Rios stopped the Chavez Shuttle on State Route 286 and determined that two of the passengers were undocumented aliens.  DSOF ¶ 8.  Jose Chavez could not recall the date of the stop and disputes the Defendants' assertion that this was the date Rios threatened him, noting that the Border Patrol records are incomplete.  PSCF[5] ¶¶ 8, 10.

---

[5] "PSCF" refers to the Plaintiffs' Statement of Facts Controverting the Statement of Facts by Defendants Rios, Demik, and Scharnweber, which begins at page 20 of the PSOF (Doc. 248).

### 2.      Defendant Demik

Defendant Demik stopped the Chavez Shuttle on March 6, 2001, to take photographs.  PSOF ¶ 53.  Demik does not recall this incident.  DSOF ¶ 18.

### 3.      Defendant Scharnweber

On January 5, 1999, Scharnweber stopped the Chavez Shuttle, which was being driven by Maria Chavez.  PSOF ¶ 56; DSOF ¶ 12.  Scharnweber initiated the stop based on his observation that it was carrying passengers from Sasabe and had previously been found to be carrying aliens.  PSOF ¶¶ 57, 58.  After making the stop, Scharnweber opened the van door and demanded documentation from the passengers.  PSOF ¶ 56.  All seven passengers on the shuttle at that time were determined to lack documentation. PSOF ¶ 61.  Scharnweber seized the shuttle, arrested Maria Chavez on suspicion of alien smuggling and transported her and the undocumented aliens to the Tucson Border Patrol station.  PSOF ¶ 62; DSOF ¶ 13.  Border Patrol Supervisor Michael Obregon could not explain to Maria Chavez why she had been detained and she was released and the van returned.  PSOF ¶¶ 75, 76.

### 4.      Defendant Hunt

On August 24, 2000, Jose Chavez was driving a rental van northbound on Arizona Route 286 on a regularly scheduled shuttle run when Hunt, who was stationary, initiated a stop by motioning to Chavez to pull over.  PSOF ¶ 80.  After stopping the shuttle, Hunt detained two undocumented alien passengers and seized the rental van by reaching into

the van and removing the keys from the ignition.  PSOF ¶ 81; HSOF ¶ 24.  Hunt directed

another agent to transport Jose Chavez to Three Points.  PSOF ¶ 81; HSOF ¶¶ 35, 36.

Hunt also stopped the shuttle during the winter of 2000-01.  PSOF ¶ 92.  Hunt

demanded that Jose Chavez return the fares to the passengers on the shuttle.  PSOF ¶ 97.

**III.    Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment is not proper if

material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318,

322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of*

*Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).    In evaluating a motion for summary

judgment, the Court must draw all reasonable inferences in favor of the nonmoving party,

and cannot make credibility determinations or perform any weighing of the evidence.

*See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55 (1990); *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).    "An issue is 'genuine'

only if there is a sufficient evidentiary basis on which a reasonable fact finder could find

for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of

the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008)

(citing *Anderson*, 477 U.S. at 248).

1    **IV.     Discussion**

2           **A.      Statute of Limitations**

3           The Defendants argue that the claims against Rios and Scharnweber are barred by

4    the statute of limitations.   "Although federal law determines when a *Bivens* claim

5    accrues, the law of the forum state determines the statute of limitations for such a claim. .

6    . .  Tolling provisions for *Bivens* claims are also borrowed from the forum state." *Papa v.*

7    *United States*, 281 F.3d 1004, 1009 (9th Cir. 2002); *see also Pesnell v. Arsenault*, 543

8    F.3d 1038, 1043 (9th Cir. 2008) (quoting *Papa*). A *Bivens* claim accrues "when the

9    plaintiff knows or has reason to know of the injury." *Safouane v. Hassett*, 514 Fed.App'x

10   691, 692 (9th Cir. 2013) (*quoting Western Ctr. For Journalism v. Cederquist*, 235 F.3d

11   1153, 1156 (9th Cir. 2000)). The forum state's personal injury statute of limitations

12   applies to *Bivens* claims. *See Van Strum v. Lawn*, 940 F.2d 406, 410 (9th Cir.1991). In

13   Arizona, personal injury actions have a two-year limitations period from the time they

14   accrue.  A.R.S. § 12–542.

15          Rios and Scharnweber assert, and Plaintiffs do not contradict, that the Plaintiffs'

16   claims are governed by the two year limitations period provided by A.R.S. § 12-542(1).

17   The Plaintiffs' allegedly harmful encounter with Defendant Scharnweber occurred on

18   January 5, 1999.  Plaintiffs filed their lawsuit in May of 2001 and amended it in January

19   of 2002.  Thus, as to the claim against Scharnweber, the action was filed outside of the

20   two year statute of limitations period and is subject to dismissal as untimely.  *See*

21   *Persnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008).

22

The application of the statute of limitations to the claim against Defendant Rios is less straightforward.  The Plaintiffs argue that the limitations defense is unavailable to Rios because he cannot establish that the stop underlying the Plaintiffs' claims against him occurred in 1997, and not at some later date within the limitations period.  In response to this argument, the Defendants point out that Jose Chavez testified that Rios threatened him the first time Rios stopped him and that that was the only time Chavez had any issue with Rios's conduct.  Coupled with the Border Patrol records that show that Rios stopped the shuttle on September 8, 1997, the defense contends that the claims against Rios are untimely.  The Court agrees.

Under Arizona law, "Once the defendant has established a *prima facie* case entitling him to summary judgment [on a statute of limitations defense], the plaintiff has the burden of showing available, competent evidence that would justify a trial." *Logerquist v. Danforth*, 188 Ariz. 16, 19, 932 P.2d 281, 284 (App. 1996) (quoting *Ulibarri v. Gerstenberger*, 178 Ariz. 151, 156, 871 P.2d 698, 703 (App. 1993)).  The Defendants have established a *prima facie* case here by presenting evidence that Jose Chavez remembers Rios threatened him the first time he stopped him and that Rios stopped the Shuttle on September 8, 1997.  The burden thus shifts to the Plaintiffs to produce evidence justifying trial.  The Plaintiffs' argument is that the records are incomplete and therefore the claim could be timely.  That argument, however, is not competent evidence of the accrual date of their claims against Rios.  Accordingly, Rios has established that the claims against him are subject to dismissal.

10

1    Attempting to overcome this conclusion, the Plaintiffs renew their contention that

2    the Defendants waived their statute of limitations defense by not raising it earlier.

3    However, the Court rejected the same argument in its Report and Recommendation on

4    the Defendants' Motion to Amend (Doc. 259).  In that Report and Recommendation, the

5    Court recommended that the Defendants be allowed to amend their answer to raise the

6    defense.  That recommendation was adopted by the District Court (Doc. 263).  The

7    Defendants subsequently amended their answer and raised the defense (Doc. 264).

8    Based on the foregoing, the Court recommends that the District Court find that the

9    claims against Scharnweber and Rios are time-barred.

10   **B.    *Bivens* Claims**

11   The Plaintiffs' claims arise under *Bivens v. Six Unknown Agents of the Federal*

12   *Bureau of Narcotics*, 403 U.S. 388, 395–96 (1971), which held that money damages may

13   be obtained for injuries resulting from a violation of the Fourth Amendment by federal

14   officials.  "The basis of a *Bivens* action is some illegal or inappropriate conduct on the

15   part of a federal official or agent that violates a clearly established constitutional right."

16   *Balser v. Department of Justice, Office of the United States Trustee*, 327 F.3d 903, 909

17   (9th Cir. 2003).  Here, the Plaintiffs contend that their constitutional rights were violated

18   during various stops of the shuttle.  The Defendants contend that the Plaintiffs'

19   constitutional rights were not violated and, even if they were, the Defendants' are entitled

20   to qualified immunity.

21

22

### 1.      Standards for Stops

Officers enforcing the immigration laws must comply with the Fourth Amendment, which protects the right of the people to be free from "unreasonable searches and seizures." U.S. Const. amend IV. An investigatory stop is lawful if an officer "reasonably suspects that the person apprehended is committing or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).  Stopping a vehicle is usually "analogous to a so-called '*Terry* stop'" and officers ordinarily may stop a vehicle based on reasonable suspicion of criminal activity.  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  Such a stop is permitted where officers "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 884 (1975).

Reasonable suspicion for a federal officer to stop a car to investigate the immigration status of the occupants depends upon the "totality of the circumstances." *U.S. v. Arvizu*, 534 U.S. 266, 277 (2002) (border patrol agent had reasonable suspicion to stop a minivan when (1) it had turned onto a dirt road frequently used by smugglers to avoid a checkpoint, (2) it had slowed when the driver saw the officer, (3) the children sitting in the back began to wave mechanically, and (4) the children had their knees propped up, as though there was cargo beneath them).

In considering the totality of the circumstances, however, "an officer cannot rely solely on generalizations that, if accepted, would cast suspicion on large segments of the

law-abiding population." *U.S. v. Manzo–Jurado*, 457 F.3d 928, 935 (9th Cir. 2006). Hispanic appearance, for example, is "of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required." *U.S. v. Montero–Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000). Moreover, while an inability to speak English is probative of immigration status, it does not supply reasonable suspicion unless "other factors suggest that the individuals are present in this country illegally." *Manzo–Jurado*, 457 F.3d at 937. The Ninth Circuit has also held that "individuals' appearance as a Hispanic work crew, inability to speak English, proximity to the border, and unsuspicious behavior," taken together, do not provide a federal immigration officer reasonable suspicion to conduct a stop. *Id*. at 932.

### 2.   Standards for Arrest

The Fourth Amendment requires an officer to have probable cause to effect a warrantless arrest or to conduct a search. *United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009). "Probable cause exists where under the totality of the circumstances known to the officer, a prudent person would have concluded that there was a fair probability that the suspect had committed or was committing a crime." *United States v. Noster*, 590 F.3d 624, 629–30 (9th Cir. 2009). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

13

### 3.   Excessive Force Standards

Excessive force claims under the Fourth Amendment are analyzed under the framework established by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). The basic test under *Graham* is one of objective reasonableness. This requires courts to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396; *see Tekle v. United States*, 511 F.3d 839, 844–45 (9th Cir.2007); *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir.2005) (en banc); *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). In doing so, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them . . . ." *Graham*, 490 U.S. at 397. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991). The Supreme Court cautions that "[t]he 'reasonableness' of a use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U .S. at 396.

In the Ninth Circuit, the objective reasonableness inquiry under *Graham* is a three-step analysis. First, the court must assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force used. *Miller*, 340 F.3d at 964. Second, the court must assess the importance of the government interests at stake

14

by considering the *Graham* factors: (1) the severity of the crime, (2) whether the suspect posed an immediate threat to the safety of the officer and others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Id. Third, the court must balance "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id*. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

"[T]he pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury." *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007) (citing *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014–15 (9th Cir. 2002) (en banc) ("[A]s a general principle . . . pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger.")). *See also Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (reiterating that "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force").

"If the evidence, reviewed in the light most favorable to [plaintiff], could support a finding of excessive force, then the defendants are not entitled to summary judgment." *Smith v. City of Hemet*, 394 F .3d 689, 701 (9th Cir. 2005). "'Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions,

15

and to draw inferences therefrom . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Id*. (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)); *see also Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n. 10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.") (citations omitted).

### 4.   Qualified Immunity Standards

To determine whether a government official sued in his individual capacity is entitled to qualified immunity, a court must first determine whether, when considered in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If not, the analysis ends and qualified immunity protects the defendant from liability. *Id*.  If a constitutional violation occurred, the Court must determine "whether the right was clearly established."  "If the law did not put the [defendant] on notice that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id*. at 202.  In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may exercise discretion in determining which of the two prongs should be addressed first.

**C.      Application of Standards to Each Incident**

**1.      Stop and Arrest by Scharnweber[6]**

In support of his January 5, 1999, stop and arrest of Maria Chavez, Scharnweber offers the following specific, articulable facts to establish reasonable suspicion for the stop:

1.      Experience, training and background knowledge of the area.

2.      The route was near the border and was well-known for the transport of illegal aliens.

3.      Very few cars travelled between Sasabe and Tucson.

4.      He had apprehended many aliens traveling on the roads around Sasabe.

5.      Sasabe was very small, with fewer than 20 residents, and very few people legitimately crossed the border, particularly on foot.

6.      Border Patrol had a long history with the Chavez Shuttle and it had been stopped numerous times and found to be carrying aliens.

7.      The Chavez Shuttle cruised Sasabe honking the horn and looking for pedestrians on the side of the road or coming out of the bushes.

---

[6] As discussed above, the Court recommends that the District Court find that claims against Scharnweber are barred by the statute of limitations.  *See* Section A.

17

8.      Chavez Shuttle tickets included a disclaimer that indicated that fares would not be refunded if the ticketholder was detained by Border Patrol.

9.      The shuttle was traveling north with seven passengers at 3:00 p.m., which was an unusual time and was during Border Patrol's shift change.

10.     The number of passengers was unusually high given the light foot traffic at the Sasabe crossing.

In response, the Plaintiffs contend that Scharnweber's claimed reasons for initiating the stop have evolved over time.  His contemporaneous report states that he made the stop because the shuttle had been found to be carrying aliens previously, that it was carrying passengers, and that it was in Tucson.  PSOF ¶ 58.  They contend that the remaining factors now cited by Scharnweber should be disregarded and, even if they are not, that they do not support a finding of reasonable suspicion.

As the Plaintiffs contend, under the relevant authority, it is questionable whether Scharnweber had reasonable suspicion to institute the stop of the shuttle.  Other than the assertion that the shuttle had cruised the streets of Sasabe looking for illegal immigrant, a fact which Plaintiffs dispute, Defendants have not cited any fact that was particular to this stop.  Scharnweber knew that the area where the stop was made was well known as a prime route for the transport of illegal alien, knew that in the fall of 1998, numerous illegal aliens had been apprehended while traveling in vehicles near the intersection of Route 86 and 286, knew that the border town of Sasabe was extremely small, and that very few pedestrians entered the United States legally through the port of entry in that

18

town.  These factors, which are based on Scharnweber's experience and training, are appropriate for consideration in deciding the issue of reasonable suspicion.  *See Whren v. United States*, 517 U.S. 806, 817-819 (1996).  However, experience may not be used to give the officers unbridled discretion in making a stop.  *United States v. Montero - Camargo*, 208 F.3d 1122, 1131-32 (9th Cir. 2000).  While the factors cited by Scharnweber make some contribution to a finding of reasonable suspicion, they are not particularized to the stop.  As such, these factors are not sufficient to form a particularized and objective basis for the stop in question.  *United States v. Arvizu*, 534 U.S. 266 (2002).

Moreover, it cannot be reasonably argued that the rights violated by Scharnweber were not clearly established at the time.  As such, Scharnweber was on notice and qualified immunity does not appear warranted.  *Saucier v. Katz*, 533 U.S. at 202.

### 2.    Stops by Hunt

In support of his August 24, 2000, stop of Jose Chavez, Hunt explains that around 9:00 p.m. that night, he was observing traffic on Route 286 about 11 miles north of the border.  HSOF ¶¶ 14, 15.  He saw a van occupied by only the driver heading south.  HSOF ¶ 16.  Shortly thereafter, a sensor went off, which indicated to him that somebody had illegally crossed the border.  HSOF ¶ 17.  About twenty minutes after he initially saw the van, he saw it heading north with two passengers inside.  HSOF ¶ 18.  Based on these facts and his training and experience, and because the border closes at 8:00 p.m., Hunt believed the van might be carrying illegal aliens and he pulled it over.  HSOF ¶ 19.  He

19

also notes that after he approached the van, he found it was driven by Chavez and that the passengers had muddy shoes and pants.  HSOF ¶ 27.  He then decided to seize the van. HSOF ¶ 34.

As was the case with Scharnweber, the Plaintiffs contend that Hunt's description of the facts supporting the August 2000 stop has evolved over time.  They contend that it was only at his 2013 deposition that he added the information about the sensor warning, PSOF ¶ 89, and it is not mentioned in his 2002 Declaration about the facts of the stop, PSOF ¶ 98.

In relation to the winter 2001-2002 stop, Hunt has a limited recollection of events. He recalls that the stop occurred at night, was very close to Sasabe, was after the port of entry had been closed for some time, that Jose Chavez was driving the shuttle, and that he determined that the passengers in the shuttle were illegally present in the United States. HSOF ¶ 39.  He also recalls telling Jose Chavez to refund the fares to his passengers, but that Chavez refused to do so.  HSOF ¶ 44.  In response, Plaintiffs state that Hunt has previously stated that a sensor had been activated and that a trainee agent had witnessed individuals run into the general store where tickets were sold.  PSOF ¶ 95.  The Plaintiffs also specifically dispute that they would have been is Sasabe for any significant portion of time after the border had closed and point out there is no contemporaneous border patrol record of the stop.  PSOF ¶ 8.  They also note that Hunt was indicted for lying to a supervisor regarding the circumstances of another stop.  PSOF ¶ 107.

20

Like Scharnweber, the facts cited by Hunt in each of these two stops, especially when considered without the disputed sensor notification, do not establish reasonable suspicion to support the stops. Also, given that the law related to stops was clearly established at the time, Hunt should have been aware that his conduct was unlawful and therefore not entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### 3. Stop and Threats by Rios[7]

The Defendants contend that the Plaintiffs did not raise a claim related to Rios's stop of the Chavez Shuttle, but only claimed that Rios's threat to strike Jose Chavez in the mouth violated the constitution. In the Amended Complaint, the Plaintiffs allege that, "[d]uring one stop, Defendant Rios threatened to strike Jose Chavez in the mouth as Plaintiff remained in his vehicle speaking with the agent." Amended Complaint (Doc. 12), ¶ 36. Additionally, at his deposition, Jose Chavez cited only this incident and did not allege that Rios had stopped him illegally. Thus, the Plaintiffs have not expressly alleged that Rios was involved in an illegal stop (as opposed to the activities that allegedly occurred after the stop*). See Bruns v. National Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (holding that "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled."); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for

---

[7] As discussed above, the Court recommends that the District Court find that claims against Rios are barred by the statute of limitations. *See* Section A.

21

1  summary judgment."); *Kaiser v. First Hawaiian Bank*, 30 F.Supp.2d 1255, 1261 n. 3 (D.

2  Haw. 1997) (same).

3      Despite these shortcomings, on appeal the Ninth Circuit coupled the express

4  allegations against Rios with general allegations that the "[i]ndividual Defendants' stops,

5  detentions, and intrusive searches of Plaintiffs' shuttle lacked consent, probable case, and

6  reasonable suspicion, and warrants," to find that the Fourth Amendment claims were

7  sufficiently alleged.  However, the statement by the Ninth Circuit appears to be collective

8  of all the events and not specific in relation to each defendant.  As such, the Court

9  recommends that the claim against Rios be evaluated based on the allegations of

10  excessive force that were actually pled.

11      As for the threat, accepting the allegation as true, the Defendants contend it was

12  not a violation of Jose Chavez's constitutional rights and, even if it was, Rios is entitled

13  to qualified immunity.  In support of their argument they cite several cases in which mere

14  threats or harsh words were found not enough to violate constitutional rights.  *See, e.g.,*

15  *King v. Olmstead Cnty.*, 117 F.3d 1065, 1067 (8th Cir. 1997); *Nunez v. City of Los*

16  *Angeles*, 147 F.3d 867, 875 (9th Cir. 1998); *Arnold v. United States*, 816 F.2d 1306 (9th

17  Cir. 1987); *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir. 1991).

18      In response, Plaintiffs cite to *Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013), and

19  *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir. 1987), to support the notion that mere

20  words can constitute excessive force.  In *Cameron*, the Ninth Circuit reversed a grant of

21  qualified immunity because the record was incomplete.  In that case, there was no dispute

22

22

1  that Cameron was suspected of relatively minor property crimes and that six to ten

2  officers entered her home early in the morning with guns drawn, pushed her down the

3  hallway and handcuffed her.  The only dispute was whether the guns were pointed at

4  Cameron's head.  713 F.3d at 1021.  In *Lester*, the arrestee alleged not only that an

5  officer threatened to hit her with his fist, but that another officer kneed her in the back,

6  that she was dragged down a hallway, and was handcuffed so tightly that her wrists were

7  bruised.  830 F.2d at 714.  These authorities clearly involve facts well beyond those they

8  have alleged against Rios and simply do not support the notion that words alone can

9  establish excessive force.

10      Moreover, even if it can be said that Rios's threats constituted a constitutional

11  violation, Plaintiffs have not established that Rios should have been aware that his

12  conduct was unlawful.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  As such, Rios is

13  entitled to qualified immunity on this claim.

14          **4.    Defendant Demik**

15      As was the case with Rios, the Defendants contend that the Plaintiffs did not raise

16  a claim related to Demik's stop of the Chavez Shuttle, but claimed only that Demik

17  violated their constitutional rights by photographing the Chavez Shuttle.  In the Amended

18  Complaint, the only mention of Demik by name involves the alleged photography

19  conducted of the shuttle by Demik.  Amended Complaint (Doc. 12), ¶ 37.  The facts

20  alleged in the Amended Complaint do not expressly allege that Demik was involved in an

21  illegal stop (as opposed to the activities that allegedly occurred after the stop*).  See Bruns*

22

23

*v. National Credit Union Admin.*, 122 F.3d 1251, 1257 (9th Cir. 1997) (holding that "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled."); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."); *Kaiser v. First Hawaiian Bank*, 30 F.Supp.2d 1255, 1261 n. 3 (D. Haw. 1997) (same).

Again, however, the Ninth Circuit coupled the express allegations against Demik with general allegations that the "[i]ndividual Defendants' stops, detentions, and intrusive searches of Plaintiffs' shuttle lacked consent, probable case, and reasonable suspicion, and warrants," to find that the Fourth Amendment claims were sufficiently alleged. However, as mentioned in relation to the claims against Rios, the statement by the Ninth Circuit appears to be collective of all the events and not specific in relation to each defendant.  Thus, just as with Rios, the Court recommends that the claim against Demik be evaluated based on the allegations that were actually pled.

In the Amended Complaint, the Plaintiffs contend that, on March 6, 2001, Demik stopped Plaintiff Jose Chavez and took photographs of the shuttle, but then "denied taking any photos and refused to provide an explanation." Amended Complaint (Doc. 12), ¶ 37.  Even assuming the allegations are true, Defendants contend that Demik's actions could not constitute a constitutional violation.  When viewed as a discreet event, there is no authority suggesting that the photographing of a vehicle in a public place could amount to a constitutional violation.  *See Dow Chemical Company v. United States*,

24

476 U.S. 227 (1986) (taking aerial photographs of an industrial plan complex from navigable airspace is not a search prohibited by the Fourth Amendment).   Under the circumstances, it appears that this alleged event is not one of such magnitude that would warrant the triggering of constitutional protections.

Moreover, even if it can be said that photographing the shuttle constituted a constitutional violation, Plaintiffs have not cited any authority that  would establish that Demik should have been aware that his conduct was unlawful.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  As such, Demik is entitled to qualified immunity on this claim.

**V.     Recommendation for Disposition by the District Judge**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **deny** Defendants Hunt's Motion for Summary Judgment (Doc. 235) and **grant** Defendants Demik, Rios, and Scharnweber's Motion for Summary Judgment (Doc. 238).

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment in the case.

The parties have 14 days from the date of service of a copy of this report and recommendation to file specific written objections with the District Court.  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.

25

Thereafter, the parties have 14 days within which to file a response to the objections. Replies are not permitted without leave of court.

If any objections are filed, this action should be designated case number: **CV 01-245-TUC-FRZ**.  Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 15th day of May, 2014.


Jacqueline M. Rateau
United States Magistrate Judge

26